By the Court, Cowen, J.
The relators Heath and Roome claim that, at the charter election for the city of New-York held on Tuesday the 12th of April last, they were duly elected assessors of the sixth ward—that this appears by the return of the ward canvassers—that a copy of the return having been received by the mayor, they presented themselves before him on the 13th inst. (May) for the purpose of having the oaths of office administered—and that he refused to administer such oaths, on the ground that the relators did not appear to have been duly elected. A motion has been made, therefore, that a mandamus issue commanding him to administer the oaths.
The motion was opposed on the ground that the return of the ward canvassers, to which alone, it was insisted, the mayor could look as the test of the election, fails to show an election; indeed that it shows there was none.
That return is special; that “ we have received returns from the several districts of the said ward, &c. copies of which re *45 turns certified by us are hereunto annexed. That it is impossible for us to declare what persons were, by the greatest number of votes, elected, by reason of lawless violence committed upon the inspectors of the first district whilst in the act of counting the ballots, and the dispersion of the ballots before they were counted; the history of which is contained in the return of said inspectors, a copy whereof is hereunto annexed.” To this is attached the certificate of a majority of the inspectors of the first district, detailing the excuse for not making any return. The number of districts in the sixth ward was four, from three of which regular returns were made, copies whereof reached the mayor and showed a majority of votes in favor of the relators who claimed to have been elected assessors. In short, the names of the candidates and number of votes given for them respectively were properly returned from the three districts ; and, independently of the votes given in the first, appear to have been sufficient in number to elect Messrs. Heath and Roome.
It does not appear, nor has it been even suggested, that the real state of the vote in the first district would, if returned, have changed the result. On the contrary, there is strong evidence to show that it would have increased the majority in favor of these men. If, therefore, the return of the ward inspectors presented a case presumptively sufficient to require the administration of the oaths, there is nothing now before us, in the answering evidence, to overthrow the presumption.
There was some dispute on the argument whether the old statute of 1813, (2 R. L. 347, § 11,) or what remains of the registry law of 1840, [Sess. Laws, p. 55, 58, § 11 fy 20,) is to govern in the frame of the ward return. The mayor contends for the application of the old statute; and he is probably right. That statute requires that the ward. inspectors shall complete the said canvass on the day subsequent to the closing of the poll, or sooner, and thereupon shall set down the names of the several candidates for the respective offices, with the number of *46 votes for each; and shall thereupon certify and declare who have the majority of votes for each respective office. This was certainly not done in all the words required by the statute; and the question is therefore raised, whether the return be not a substantial compliance.
It is supposed that the loss of the votes in the first district, by such violence as to separate the inspectors from the ballots which they were in the act of counting, so that they did not feel warranted in speaking officially as to the number, necessarily left the question of election in so much uncertainty as to be without legal remedy short of a new election. We think not. In no case we are aware of has it ever been held, that the accidental loss of the ballots in a single subdivision of an election district, even though it prevent a return, shall, of itself, defeat, or indeed detract from the election as it stands on the votes which are properly returned. Once admit the principle that the loss of a part of the votes out of the number which may or should be given at an election, avoids the whole, and it is difficult to conceive how a system of government so entirely elective as ours could be carried on. The principle is the same, whether considered in reference to elections in municipal corporations, to county, district or state elections, or even a federal election for president. That a part of the votes given are lost, is never allowed, per se, even in a private corporate election, as a ground for setting the election aside. It is not enough to say the result is therefore uncertain. (Ex parte Murphy, 7 Cowen, 153.) Yet the contrary rule would be much more tolerable in the case of private corporations, than in that of large municipal and civil divisions. To give the loss any effect, it must, at least, be shown that, without its happening, the Result would have been different. (Id. ; The People on the relation of Benton, v. Vail, 20 Wend. 12.)
The idea which we understood to be thrown out in argument, that the return from -the sixth ward was void because not completed till the 14th of April, instead of the 13th, is altogether *51 cil shall have the sole power of determining and deciding all elections of all corporate officers, (Kent’s charter, 56,) and the amended charter of 1830, (Kent’s charter, 100, § 7, Sess. L. of 1830, p. 126,) that each board shall be the judge of the qualifications of its own members. It is quite doubtful whether the word qualifications can, by the most liberal construction, be made to comprehend elections. Admitting the clause, however, to mean that each board shall be judges whether its members have been duly elected, it would still be difficult to show that the enactment amounts to any thing more than the bestowment of a power concurrent with our own. It is, too, a power that has never been exercised in the case before us. The question is not res judicata. The words do not, like those of the Montgomerie charter, speak of a sole power in the common council. Were the question on this application for a mandamus to be deemed identical with a question of election, within the meaning of the charter, we might then be called on to decide whether the words are so explicit as to take away our jurisdiction ; and if so, whether, standing as they do in a mere royal charter, not in a statute like the amendment, it was within the constitutional competency of the king to take from the jurisdiction of his courts without the concurrence of parliament ; if not, whether the statute of 1732, (6 Geo. 2, Bradford’s ed. of Col. Laws of 1726,) was intended to confirm such parts of the charter as were void. So of subsequent legislative or constitutional reservations and provisions. (Vide Kent’s charter 177, note 53, G. G. G.) I will merely remark, that the jurisdiction of the king’s bench, which court we have by the revolution succeeded, was declared by the common law; (vid. Lawton v. Com. H. W. of Cambridge, 2 Cain. Rep. 179, 182 ; 2 R. S. 123, 2d ed. § 1 ;) and the dispensing power was in bad odor when the Montgomerie charter issued. The charter, therefore, considered as such, was probably void so far as it sought to repeal the acknowledged law under which the K. B. enquired into the regularity of elections, by its writ of mandamus, or quo warranto, or information in nature of a quo war *52 ranto. If the words of the charter had, or came afterwards to have, the force of a statute, still it might be answered, that it contains no clause expressly denying to the king’s bench, or the court holding its place, the exercise of its general power in the particular case. The word solely, might, by a liberal construction, imply an intent to take away the power. So might a statute declaring the decision of an inferior court conclusive or final, be construed to take from this court the power to review the decision by certiorari. But it has often been held, that these or the like words shall not be construed to divest the superior court of its supervisory power; and that, to give a statute such an effect, the legislature must say in so many words that they intended to take the power away. (Lawton v. Com. of H. W. of Cambridge, 2 Cain. Rep. 179.) So, where a statute declares the proceeding of the inferior court to be without appeal. (The King v. The Commissioners of Fens, 2 Keb. 43.) In Rex v. Moreley, (2 Bur. 1040,) the objection arose on a statute, the words of which were peculiarly strong, viz : JVb other court whatsoever shall intermeddle with any cause or causes of appeal upon this act, but they shall be finally determined by the quarter sessions only ; which words, it was contended, must include all the courts in the kingdom, and the K. B. in particular, as being most likely to meddle with matters of this kind. Counsel moved for a certiorari, and cited several cases to show that the jurisdiction of the K. B. is not taken away by mere negative words in an act of parliament—that that court shall never be ousted of its jurisdiction without special words. To this the court agreed, saying: “ The jurisdiction of this court is not taken away, unless there be express words to take it away.” Giving to the words of this charter, therefore, all the force of an act of parliament, the answer recurs, the king’s superior court is not named; nor is it said, that no court shall take cognizance of the election by writ of mandamus, &c. I should think some such express words necessary.
But take it to be an expréss''enactment saying, this court shall not judge of the election; yet it is entirely clear that *53 it does not extend to collateral questions, especially to our power of issuing a mandamus touching a matter incidental to the question of election, and thus commanding oaths to he administered by proper persons, to such officers of the city corporation as may appear to be properly elected. The question of a rightful election may, it is true, be to a certain extent involved in such a proceeding; hut that is accidental. The action of the common council annulling the election so in question might conclude us upon the motion, and even embarrass the proceeding by information in the nature of a quo warranto. So, too, whatever we might direct to be done by the mandamus might be rendered nugatory by the subsequent action of the common council; but we are by no means prepared to admit, that the mere declaration of this power in the common council, however strong, clear and exclusive, so long as the power is altogether unexercised, shall oust us of jurisdiction to examine the question when, arising incidentally, it becomes necessary to consider it for the purpose of exercising an admitted power.
Rule accordingly, (a)

 These cases were removed by writ of error into the court for the correction of errors, where they were argued in June, 1842, and the judgment of the supreme court unanimously affirmed.